In re GIC GOVERNMENT
SECURITIES, INC.,
Debtor.

George HADLEY, Trustee, Plaintiff,

v.

GULFSTREAM CAPITAL GROUP,
INC., and Jeffrey Fisher,
Defendants.

Bankruptcy No. 85–2784–BKC–8P7.
Adv. No. 87–461.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 7, 1989.

George Hadley, Bankruptcy Trustee.

Robert Quinn, Tampa, Fla., for trustee.

Richard C. Prosser, Tampa, Fla., for defendant.

FINDINGS OF FACTS, CONCLUSIONS
OF LAW, MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a stockbroker liquidation case, and the matter under consideration is an adversary proceeding filed by George Hadley, the Trustee of the Debtor, GIC Government Securities, Inc. (GIC), against Gulfstream Capital Group, Inc. (Gulfstream), and Jeffrey Fisher (Fisher), Defendants. The Complaint sounds in three counts. The claim in Count I seeks an order from this Court determining that certain transfers of monies made by the Debtor to the Defendants were fraudulent transfers pursuant to 11 U.S.C. § 548(a). Count II requests an accounting of the payments made by the Debtor to Gulfstream and demands a judgment for the amount of any payments. Count III likewise seeks an accounting of any payments made to Defendant Fisher, and also demands judgment for those payments. It appears that the Trustee at the commencement of the final evidentiary hearing voluntarily dismissed Count III and, therefore, a judgment will be entered dismissing it with prejudice. The Defendants filed an answer, affirmative defenses and counterclaim. The claim in Count I of the Defendants' Counterclaim asserts a right of setoff of certain monies returned to the Plaintiff. The claim in Count II seeks an accounting from the Plaintiff to determine whether any monies received by the Defendants were actually disbursed by GIC or any of its affiliates. The claim in Count III is based on an action for breach of an agreement to provide financing to one of the Defendants, Gulf Stream. The following facts which are rel-

evant and germane to the matters under consideration were established at the final evidentiary hearing and are as follows:

The Debtor, GIC, is a Tennessee corporation and is a successor in interest of J.E. Evans Company, also a Tennessee corporation. Both Evans and GIC were engaged in selling securities to the public at large. On December 1, 1984, Lonnie Kilpatrick purchased all the outstanding shares of stock in GIC from his brother, John Kilpatrick. Initially, GIC maintained offices in Tennessee, but it gradually transferred its entire operation to Tampa, Florida. GIC was licensed by the State of Florida to operate as a securities dealer in government securities initially on June 8, 1982. It appears that Anthony Labozzetta was the general counsel for GIC, as well as general counsel for Lonnie Kilpatrick, the Debtor's sole shareholder and president.

Gulfstream, one of the defendants, was formed in late 1984 to act as a developer in connection with the construction of the Hampton Inn, a 135–room hotel near the airport in West Palm Beach, Florida. It appears that Fisher, the other named Defendant at the time relevant, was president of Gulfstream. Fisher and Ernie Higgins, another principal in Gulfstream, negotiated a ground lease with Rinker Materials Corporation, the owner of the land on which the Inn was to be constructed. They also negotiated with Hampton, Inc., for a franchise agreement. It appears that Gulfstream, in order to construct the Hampton Inn, had to secure funds for the project in the amount of $1,500,000.00 by June 1, 1985. Fisher and Higgins approached Labozzetta, whom they had first met in early 1983 in connection with GIC's effort to participate in two real estate transactions known as the Kimberly Executive Center and Link Park Travel Lodge. In this transaction, GIC agreed to act as a syndicator and to raise equity funds for a partnership which would be formed to acquire the buildings. Fisher and Higgins on behalf of Gulfstream Capital negotiated with Labozzetta and structured the same type of deal as mentioned above such that GIC would act as syndicator and raise the equity funds

for a partnership which would then be formed to develop the Hampton Inn.

It is without serious doubt that GIC agreed to provide Gulfstream with $250,000.00, which character of this transaction is in dispute, and which Defendant contends was a nonrefundable deposit, and which the Trustee contends was merely a loan. However, there is nothing in this record to establish that there was ever any agreement by GIC to become an acquired equity ownership partner in this project either in the partnership, if one was to be formed, or in a joint venture. On the contrary, the record warrants the finding that the role of GIC was clearly nothing more than the provider of funds to Gulfstream to enable it to meet the initial start-up costs consisting of the downpayment to Rinker.

The funds received were to be for the down payment on the Rinker lease and for certain soft costs relating to the development, such as appraisal fees, engineering costs, and the franchise application fee. It is contended by Fisher that these funds represented GIC's interest in the venture in which GIC was supposed to acquire an equity interest. There is no credible evidence to support this proposition.

Pursuant to the agreement, certain wire transfers were made from funds of GIC held by Labozzetta in his trust account to Gulfstream on the following dates and in the following amounts:

| Date | Amount |
|---|---|
| January 23 1985 | $ 20,000.00 |
| February 6 1985 | 91,000.00 |
| February 28 1985 | 50,000.00 |
| April 22 1985 | 50,000.00 |
| May 22 1985 | 11,000.00 |
| TOTAL | $ 222,000.00 |

(Fisher Deposition, pp. 53–55)

It appears that sometime in December 1985 Gulfstream returned $100,000.00 it had received from Labozzetta back to Labozzetta's trust account. (Labozzetta's Deposition, p. 39 and Fisher's Deposition, p. 52)

It is Gulfstream's contention that the entire $250,000.00 transferred to it from Labozzetta was a nonrefundable security

deposit. Gulfstream contends that its principal Fisher reached an agreement with Labozzetta sometime in early January 1985 that a GIC entity would deposit $250,000.00 and that deposit would not be refundable. This agreement, however, was never reduced to writing. It is important to note in this connection that Fisher acting as president of Gulfstream never discussed this transaction directly with GIC's president, Lonnie Kilpatrick. Even accepting Gulfstream's argument that the $250,000.00 paid by Labozzetta on behalf of GIC was a nonrefundable deposit, the transfer would still be avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(2) which provides in pertinent part that the trustee may avoid any transfer of an interest of a debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntary received less than a reasonably equivalent value in exchange for such transfer or obligation and was insolvent on the date such transfer was made. This Court is satisfied that GIC was insolvent from December 1984 forward and was insolvent on the date the funds were transferred by Labozzetta to Gulfstream. (Foley Deposition, pp. 19–25) While Gulfstream and Fisher intimate that GIC was to receive a fee from the Defendants once GIC was able to secure the funds for the construction loan, there is no evidence in the record to support such arrangement, and the fact of the matter is that there is no evidence that a fee was even agreed upon. Therefore, this Court is satisfied that GIC received nothing in return for giving a $250,000.00 nonrefundable "deposit" to Gulfstream for its immediate use. In addition to the overwhelming evidence indicating that the $250,000.00 was a loan instead of a nonrefundable deposit made to Gulfstream, Gulfstream's own conduct indicates the same. Gulfstream itself wired to GIC $100,000.00 (Fisher Deposition, pp. 51–53). For all the foregoing reasons, the evidence is clear that GIC made a loan of $250,000.00 to the Defendants at 14% interest. Assuming, but not admitting, that this was not a loan after all, but was a

$250,000.00 nonrefundable "deposit", GIC was insolvent at the time of the transaction and it received nothing of an equivalent value in return, and hence, the transfer is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(2).

Based on the foregoing, a separate Final Judgment shall be entered in accordance with the foregoing.